# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                     Plaintiff,                Case No.: 22-cr-20365

v.

                                          Honorable Gershwin A. Drain

SHELDON AVERY THOMAS,

                     Defendant.

_____/

### Government's Response and Brief Opposing Defendant's Motion for Revocation of Detention Order (ECF No. 12)

*"Monie wasn't the type of guy that you really wanted to have beef with... Monie was not to be fucked with." – Sheldon Thomas*

Despite knowing that Ehmani "Monie" Davis was dangerous, Sheldon Thomas worked diligently to put a gun in his hands. It wasn't easy; Thomas' first attempts to buy a gun for Davis failed. But, on June 7, 2022, he was finally successful, purchasing a Draco pistol—a handgun that shoots rifle rounds—and immediately handing it over to Davis. Less than a month later, Davis used the Draco to murder Detroit Police Officer Loren Courts.

Ehmani Davis was not the only person that attempted to illegally acquire firearms through Thomas. In addition to Davis, at least twice in the last six months other people reached out to Thomas about buying guns. Among his social circle, he was known as a source for weapons.

Sheldon Thomas is dangerous. He has flaunted state, local, and federal laws regulating how persons may buy, sell, and obtain firearms. He has disregarded these laws on multiple occasions. His reckless disregard for the law makes him a danger to everyone, but especially to the police officers tasked with the duty of trying to make this community a safer place. Thomas' motion for bond should be denied.

## I.    Facts

### A. Thomas and Davis

Sheldon Thomas—26 years old—and Ehmani Davis—19 years old—were best friends, according to Thomas. That is corroborated by Thomas' cell phone. In an 11-month period, Davis and Thomas exchanged 369 calls and texts. Their text messages give a glimpse into the nature of their friendship. In a text conversation on July 14, 2021, Thomas and Davis discussed dealing with people who steal from you and getting guns.

> ***Davis***: I ain't laughed one time
>
> ***Thomas***: Yea it's cuz that's yo life they took I can always go buy another gun which is exactly wat I'm fina do Friday anyway so [to be honest] I really don't give [a single fuck] it's the principle for me #itswar
>
> Just low down slimy and grimy soft ass n****s bro it be so many n****s in dere talkin crazy but wanna do shit under the radar and be tough later just soft [as hell]
>
> ***Davis***: Man if another n**** take anything from you that's disrespect. I was taught whoever you catch stealing chop his hands off

3

I'm on n****s ass tomorrow.

**Thomas**: Facts I'm up there witchu period if any n**** say one thing out the way it's a wrap.

*See Exhibit 1*, Thomas and Davis Texts 07.14.21.

Thomas told ATF agents he knew Davis "always had beef in the street" on top of problems he had with his own family. Thomas told agents the last incident he knew about with Davis was when Davis and his brother had an argument that resulted in the brothers pointing guns at each other's heads.

Thomas also told ATF agents that he continued to be Davis' best friend even after believing that Davis took his Smith and Wesson 9mm firearm. ATF agents corroborated that Thomas owned a Smith and Wesson 9mm pistol by obtaining the 4473 form Thomas filled out to purchase the firearm and the pistol sales record. *See Exhibit 2*, 4473 Form Smith and Wesson – 04.30.20. However, Thomas never reported the firearm as stolen because Davis was "still [his] boy."

Davis felt comfortable asking Thomas to buy a firearm for him on multiple occasions. On August 7, 2021, Thomas and Davis exchanged the following text messages:

**Davis**: Bet it up and my brotha said he would take us

**Thomas**: U got all the cheese?

**Davis**: Damn near. But if you can't make a bargain wit em ima get something else

**Thomas**: Like what send me a picture the price I need details ion

4

wanna have to walk out and ask it'll make us look suspicious

**Davis**: Ima go in first trust me we gone play it smooth

**Thomas**: Play it cool

See Exhibit 3, Thomas and Davis Texts 08.07.21.

In these text messages, Thomas and Davis used coded language, but their intent is obvious. The item Thomas and Davis were discussing purchasing on August 7th was one that Thomas could legally purchase, and Davis could not. It was an item that they were worried about arousing suspicion over. It was an item that Davis was specifically selecting, and Thomas needed a picture of to recognize. It was a handgun. This conclusion is supported by Thomas and Davis' later messages wherein Davis explicitly asks Thomas to purchase a handgun for him on three separate occasions.

### B. The February 13, 2022 Attempted Straw Purchase for Davis

Thomas attempted to purchase a handgun for Davis in February 2022. On February 13, 2022, Thomas and Davis exchanged the following text messages:

**Davis**: Bet bro I gotta do dis shit today n****s had slid through yesterday but it was the wrong house

I got the money on me right now

**Thomas**: The money for the stick?

**Davis**: Yea and I'll throw u some extra just for looking out for me

…

> ***Thomas***: Send me the stick u want and the beans u want with it[1]
>
> ***Davis***: I already talked to the people he said he has it in stock
>
> ***Thomas***: [Alright] bet
>
> The beans hallow [sic]
>
> ***Davis***: Yea

*See Exhibit 4*, Thomas and Davis Texts 02.13.22–02.18.22.

The two continued to exchange messages on February 13th, discussing the arrangements for Davis to pick Thomas up and give him a ride, and Davis reminded Thomas not to forget his I.D. *Id.*

That same day, Thomas attempted to buy a Glock 19 Gen 5 handgun—a firearm capable of shooting hollow-point bullets—from ICB Firearms in St. Clair Shores, Michigan, a Federal Firearms Licensee ("FFL"). *See Exhibit 5*, 4473 Form Glock 19 Gen 5 – 02.13.22. In completing the form, Thomas represented he was the actual buyer of the firearm and that he was not purchasing the firearm on behalf of another person. *Id.* Thomas' NICS background check was delayed, and Thomas was not allowed to take the gun home that day. The FFL directed Thomas to return on February 18, 2022 to complete the purchase of the firearm. However, on February 18, 2022, Davis texted Thomas that he had found something "for way cheaper" and Thomas did not return to ICB Firearms to complete the purchase of

---

[1] A "stick" is a frequently used colloquial term for a gun. "Beans" is a colloquial term for bullets.

the Glock 19. *See Exhibit 4*.

### C. The May 29, 2022 Attempted Straw Purchase for Davis

On May 29, 2022, Thomas and Davis went together to Action Impact, an

FFL in Eastpointe, Michigan. *See Exhibit 6*, Surveillance Video from Action

Impact on 05.29.22. Thomas told agents he and Davis went to the FFL because

Davis wanted Thomas to buy him a Glock 22 handgun. Davis was only 19 years

old and was prohibited from purchasing a handgun. Thomas attempted to purchase

a Glock 22 .40 caliber handgun for Davis. Again, Thomas filled out and ATF 4473

form, and again represented that he was the actual buyer of the firearm and that he

was not purchasing the firearm on behalf of another person. *See Exhibit 7*, 4473

Form Glock 22 and Draco – 05.29.22. Thomas' NICS background check again

resulted in a "delayed" status, and Thomas was instructed to return to complete the

purchase on June 7, 2022. *Id*.

### D. The June 7, 2022 Straw Purchase of the Draco for Davis

On June 2, 2022, Davis sent Thomas a text telling him he had just been

released from jail. Davis asked Thomas to call Action Impact and told Thomas that

he still had money for him. *See Exhibit 8*, Thomas and Davis Texts 06.02.22–

06.11.22. Two days prior, Davis had been arrested in Eastpointe for threatening to

kill someone and disorderly conduct. *See Exhibit 9*, Eastpointe Case Report.

On June 7, 2022, Davis reached out to Thomas again. Davis sent Thomas the

7

phone number to Action Impact, and Thomas responded that he was ready. *See Exhibit 8*. The two then discussed the arrangements for Davis to transport Thomas to Action Impact. *Id*.

On the afternoon of June 7, 2022, Thomas showed up to Action Impact, this time by himself. Thomas told ATF agents that Davis didn't go with him to complete the purchase because Davis did not want his face to be on camera again. Davis' directions to Thomas changed since the attempted purchase on May 29th. Instead of a Glock 22 handgun, Davis instructed Thomas to buy him a Draco pistol. Davis gave Thomas the cash—more than $1,200—to complete the purchase. On surveillance video from Action Impact, Thomas entered the store, completed the 4473 Form, gun purchase checklist, and sales paperwork. *See Exhibit 7* and *Exhibit 10*, Surveillance Video from Action Impact and White Castle on 06.07.22. While inside the FFL, Thomas confirmed with Davis that he wanted 30 bullets. *See Exhibit 8*, p. 12. Davis told Thomas he was just down the street, waiting at bus stop by White Castle. *Id*. at 7. When the sale was completed, Thomas walked out of Action Impact with the Century Arms Draco pistol and two boxes of 7.62x39 caliber ammunition. *See Exhibit 7* and *Exhibit 10*. After leaving the FFL, Thomas met up with Davis in the White Castle parking lot. *See Exhibit 10*. Thomas then gave the firearm to Davis. Davis paid Thomas approximately $50 for buying the gun for him.

On July 7, 2022, Davis used the Draco pistol to murder Detroit Police Officer Loren Courts. Officer Courts and his partner were responding to a call for shots fired when they encountered Davis. Immediately upon arriving on the scene, Davis began shooting at them. Officer Courts was struck twice, and later succumbed to his injuries. Davis was killed by police. Officers recovered the Draco pistol from Davis' possession. Officers also recovered the spent 7.62 caliber spent casings from the scene. Image A is a photograph of the Draco pistol.



*Image A*

When ATF agents confronted Thomas with what Davis had done, Thomas

9

told the agents that he had called Davis on June 20, 2022 and specifically told him

"Don't do nothing fucking stupid because my name is on it," referencing the Draco

pistol.

### E.  Evidence of Other Straw Purchases

Thomas' reputation as a source for guns extended beyond Davis. Twice in

the last six months other individuals texted Thomas about getting a gun. In one

instance on January 26, 2022, Thomas exchanged the following messages with a

contact saved in has phone with the initials "L.D.":

> **L.D.**: Aye Sheldon this lil bro that you gone get the heaters[2] for
>
> Aye big bro I thought you said to call you anytime after 12
>
> **Thomas**: Yea I'm just really getn up had to work late we might have to go tomorrow tbh my money don't get on my card til like 3-4am
>
> But I still gotchu I ain't forget

*See Exhibit 11*, Thomas and "L.D." Texts 01.26.22.

Later, on May 25, 2022, Thomas exchanged the following messages with his

girlfriend, whose initials are "S.D.":

> **S.D.**: Bae
>
> BAE
>
> That's it.
>
> **Thomas**:  $600

---

[2] "Heaters" is a frequently used colloquial term for guns.

Not dealin wit dem directly tho only through u if they want it they give u tha cheese and u give me tha cheese and I give the gun to u to give to them

If not that we can't do it

**S.D.**: Duh

But he not answering

**Thomas**:  When he do let me know

*See Exhibit 12,* Thomas and "S.D." Texts 05.25.22.

These text messages create the reasonable inference that there may be other firearms purchased by Sheldon Thomas on the behalf of other, unknown individuals circulating in the community. Thomas' texts with his girlfriend evidence Thomas' willingness to purchase firearms for individuals that may not have been known to him for the cost of $600.

## II.    Procedural History

On July 9, 2022, Thomas was arrested charged in federal criminal complaint with making a false statement in acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6). (ECF No. 1). Pretrial Services recommended that Thomas be detained pending trial. On July 12, 2022, Magistrate Judge Jonathan Grey agreed with Pretrial Services and the government and ordered Thomas detained after a lengthy detention hearing. Magistrate Judge Grey thoroughly outlined his

11

reasons for detaining Mr. Thomas. *See Exhibit 13,* Detention Hearing Transcript, pages 43-56. On July 14, 2022, Thomas filed a motion asking this Court to revoke the Order of detention. (ECF No. 12).

### III.    Argument

#### 1.    Nature and Circumstances of the Offense

The nature and circumstances of Thomas' offense are exceptionally dangerous. This crime does not represent a simple lapse in judgment for Thomas. Rather, it was the product of concerted and repeated efforts to put a handgun in the hands of a person he knew to be dangerous, and who was legally prohibited from purchasing such a firearm. After multiple failed attempts, Thomas was successful in arming Ehmani Davis—a person he described as someone who "was not to be fucked with"—with an assault style weapon. Thomas is before the Court today as a result of the choices he made time and time again.

Thomas had multiple warning signs that Davis was a dangerous person in a dangerous situation. Thomas knew Davis had taken a 9mm handgun from him not long before he attempted to purchase Davis another firearm. Thomas knew that Davis was recently released from jail when he solicited Thomas to buy the Draco pistol. Thomas knew Davis was a person who "always had beef in the streets." And, Thomas knew the details of at least one specific incident where Davis put a gun to his brother's head after an argument. In this respect Thomas is different

12

from many of the straw purchasers that come before this Court; Thomas took a knowing risk by purchasing a firearm for a person he, himself, described as a person you didn't really "want[] to have a beef with." Thomas created and deliberately disregarded the risk that the Draco pistol would be used to criminally injure or kill another person, which is exactly what happened.

The end result of Thomas' actions is a police officer who was killed for simply doing his job. Officer Courts will never return home to his children or his wife because of Sheldon Thomas' choices. This Court can and should consider the damage caused by firearm that Thomas unlawfully obtained and distributed. United States v. Ratliff, 1995 WL 299030 (6th Cir. 1995)(shooting of a State Trooper by individual using firearm unlawfully sold by the defendant properly considered part of defendant's relevant conduct at sentencing). Where a defendant like Thomas unlawfully obtains and transfers a firearm to someone who he knows to be dangerous, it is plainly a reasonably foreseeable consequence that someone else—including police officers—could be shot and seriously injured or killed.

Instructively, in United States v. Kendricks, this Court found the nature and circumstances of the offense to be "unquestionably dangerous" and weigh in favor of detention where the defendant lied on a federal form in order to purchase an assault style weapon and immediately passed it to a prohibited person. Kendricks, No. 22-CR-20029, 2022 WL 1154608, at *3 (E.D. Mich. Apr. 19, 2022). There,

13

this Court found the nature and circumstances to be dangerous specifically because Kendricks made the sale knowing that the individual could "do something bad with the gun." Id.

In Kendricks, the defendant purchased a Kel-Tec Model RDB Rifle for a complete stranger and had only a generalized fear that the person could do something bad with the gun. Here, Thomas was so concerned about Davis doing something dangerous with the gun that he called Davis and specifically told him not to "do anything stupid," because the gun was still in Thomas' name. Thomas knew about the "beef" Davis had with people "in the streets," was aware that Davis was recently released from jail, and knew that Davis aimed a gun at his brother's head after an argument. Despite that knowledge, Thomas purchased him an assault style weapon arguably more dangerous than the gun in Kendricks. A Kel-Tec Model RDB Rifle is a 5.56×45mm caliber rifle with an overall length of 27.3 inches. By comparison, the Draco pistol Thomas purchased for Davis is a 7.62X39mm caliber pistol with an overall length is 21.50 inches. The Draco pistol is a more concealable firearm with larger ammunition, which—due to the bullet size and grain—delivers a larger amount of kinetic energy into its target. The Draco pistol is a serious weapon designed for war. Image B is a comparison of 7.62X39mm and 5.56×45mm ammunition.



***Image B:*** *7.62X39mm ammunition (left) and 5.56×45mm ammunition (right).*

Considering the nature of firearms is not new in the context of the calculus of pre-trial release under Section 3142(g). Courts have considered the nature of firearms purchased outside the regulatory framework a legitimate Section 3142(g) concern. See <u>United States v. Lemoine,</u> 450 F. Supp. 2d 99, 101-02 (D. Maine 2006) (considering the type of firearms - "small, easily concealed and serious," and not suitable for hunting or target practice - as weighing in favor of detention).

### 2. Weight of the Evidence of Thomas' Dangerousness

The weight of the evidence of Thomas' dangerousness is significant. Law enforcement has obtained records indicating that Thomas attempted to—and ultimately did—purchase firearms for someone who was legally precluded from purchasing them for himself. The firearm and ammunition Davis sought is

inherently dangerous; Davis requested Thomas purchase hollow-point bullets and a pistol that shoots rifle rounds. Weaponry like that is designed for damage, not for hunting. Law enforcement also obtained records indicating that Thomas purchased another firearm—a 9mm Smith and Wesson—which is no longer in Thomas' possession. Those records are corroborated by the contents from Thomas' cell phone and his own statements. Text messages on Thomas' own phone evidence his reputation within his social circle as a source for firearms. Additionally, the charge here is now supported by a grand jury indictment finding probable cause. (ECF No. 13).

### 3. History and Characteristics of the Defendant

Thomas' past conduct and judgment have proven to be terrible. Outside of the charged offense, Thomas' recent history shows that he made false statements on firearm purchase forms on multiple occasions while attempting to acquire firearms for Davis. *See Exhibit 5 and 7.* He also declined to report the theft of a handgun by Davis to law enforcement because Davis was "still [his] boy." Thomas' text messages evidence that the reputation he held in his social circle was that of someone who could and would acquire firearms for others. *See Exhibits 11-12.*

In August 2021, Thomas killed a man. He picked up a gun and shot him, killing him instantly. That killing has been determined to have been a justifiable

homicide. But even so, Thomas should recognize the lethality and dangerousness of firearms more than most.

Thomas has no stable employment history, no high school diploma, and seemingly receives much of his support from his mother and brother. Thomas has no criminal history, but this Court should give that consideration substantially less weight than it might ordinarily be accorded precisely because firearms trafficking offenses like this one must, of necessity, always involve defendants who have no felony convictions and minimal criminal history.

### 4. The Seriousness of the Danger Posed to the Community

This district has a gun problem.[3]  In any discussion about gun regulations, one question is inevitable: if there are laws in place to prevent it, how do criminals get their hands on guns? Sheldon Thomas is the answer. Thomas and other straw purchasers just like him are putting guns into the hands of people with violent intentions like Ehmani Davis.

Firearms-related violence is a significant problem in the City of Detroit, one that has taken a staggering toll in terms of human lives and suffering. All of this

---

[3] According to the latest judicial caseload statistics, 575 cases were filed in the Eastern District of Michigan in 2021. Of those, 208—more than 36% —were firearm and explosive cases. See Administrative Office of the U.S. Courts, U.S. District Courts Criminal Federal Judicial Caseload Statistics (March 31, 2021), available at https://www.uscourts.gov/statistics/table/d-3/federal-judicial-caseload-statistics/2021/03/31.

violence obviously begins with the perpetrators acquiring firearms. In 2020, there were 327 homicides as well as 1,173 non-fatal shootings inside the city. *See* Detroit Police Department 2020 Year End Stats (available at https://detroitmi.gov/sites/detroitmi.localhost/files/2021- 01/2020%20Year%20End%20Stats.pdf). Firearms recovered from such incidents are known as "crime guns" and are defined as those illegally possessed, used, or suspected to have been used in furtherance of a crime.

The statistics for Detroit in 2021 were comparable, with the department reporting 309 homicides and 1,065 non-fatal shootings. *See* DeJanay Booth, Report: Detroit Homicides, Non-Fatal Shootings Drop In 2021, (January 6, 2022), https://detroit.cbslocal.com/2022/01/06/report-detroit-homicides-non-fatal- shootings-drop-in-2021/. As unacceptably high as these numbers are, these numbers do not count other criminal offenses involving firearms such as robberies, threats, and shots fired where no one is hit. What all these numbers add up to is a city where the core right of its citizens to live in their homes and on their streets without fear for their physical security is an uncertain right, at best.

Given the nature of the charges in light of the fact that Thomas has purchased at least one firearm[4] that has not yet been recovered, and could

---

[4] ATF agents remain committed to investigating the full scope of Thomas' acquisition of firearms. Unfortunately, there is no simple way to find out the number of firearms Thomas has purchased or attempted to purchase. There is no

potentially purchase more guns in the future, his release would pose a substantial

risk to the safety of the community. United States v. Tyson, 2008 WL 4415298, *3

(D.V.I. September 23, 2008) ("Those who sell guns illegally [....], cause great harm

to the community. If Tyson is released on bail, he may continue to facilitate the

influx of dangerous firearms into the community. Those weapons may end up

hurting members of the community").

Courts' recognition that the communities are put at risk by the unlawful

trafficking of firearms into the hands of persons outside the regulatory framework

(be it federal, state, or local) of firearms ownership and possession is becoming

increasingly routine in the context of the determination of pre-trial release under

Section 3142(g). See United States v. Alfred, No. 16-cr-245-01-WSD, 2016 WL

5389185, at *2 (N.D. Ga., Sept. 27, 2016) (affirming magistrate judge's detention

order based on danger to the community where defendant was charged with

falsifying records submitted to a federally licensed firearms dealer as part of a

scheme to purchase multiple firearms and transfer them to unidentified persons in a

manner that made defendant "a spigot of a gun pipeline of unknown length," and

noting that "[t]he distribution of weapons to unknown persons presents the clear

risk that they are now available to cause harm to others"); United States v. Focia,

---

centralized repository for ATF 4473 forms. As such, ATF agents are reaching out
directly to each FFL—both brick and mortar and online—in Michigan to inquire
about past attempted and completed firearms purchases by Thomas.

No. 15 CR 17-MHT, 2015 WL 1387949, at *1 (M.D. Ala. March 25, 2015) (denying motion for release by defendant in Section 922(a)(1)(A) prosecution involving transfer of firearms to "anonymous users ... who, for all [defendant] knew, could have used the weapons for violence" and "rais[ing] concerns that he has knowingly facilitated violence by others, in that he has secretly sought to furnish illegal weapons to those who, because the weapons are underground and illegal, are much more likely to have purchased guns for nefarious use"); and Tyson, at *3 (affirming magistrate judge's detention order and finding that dangerousness to the community warranted detention of defendant who had no criminal history but who was charged with violating Section 922(a)(1)(A) by bringing at least 20 guns into the judicial district during 2008, and noting that "the unlicensed dealing in firearms facilitates criminal access to guns and can increase violent crime"). In each of those cases, the knowledge that the guns purchased by the defendants would be used to commit crime was more attenuated than the circumstances present here. Thomas knew Davis was a dangerous person in a dangerous situation. And in this case, the very concerns raised by the above courts were shown to have come to fruition: the firearm Thomas purchased for Davis was used to murder a Detroit Police Officer.

Firearms trafficking is an offense that can be committed without leaving this judicial district, or even leaving home or the range of an electronic monitor. The

fact remains that Thomas could return to a private firearms seller today and obtain as many guns as he wanted. No condition of release can prevent that. And where Thomas has already proven that he is willing to flaunt state, local, and federal laws regulating how persons may buy, sell, and obtain firearms, the danger posed to a community already awash in crime guns is too great. Under all these circumstances and given the charged offense conduct, no condition or combination of conditions for Thomas' release will reasonably assure the safety of the community.

## IV.   Conclusion

Defendant Thomas presents a danger to the community. For the reasons offered by Pretrial Services, the reasons articulated by Magistrate Judge Grey during the detention hearing, and the reasons listed above, the Court should deny the motion and Thomas should remain detained pending trial.

Respectfully submitted,
DAWN N. ISON
United States Attorney

s/*Barbara K. Lanning*
Barbara K. Lanning
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9103
barbara.lanning@usdoj.gov

Date: July 19, 2022

21

## Certificate of Service

I hereby certify that on July 19, 2022, I electronically filed the Response for the United States with the Clerk of the Court of the Eastern District of Michigan using the ECF system, which will send notification of such filing to all counsel of record via electronic mail.

s/*Barbara K. Lanning*
Barbara K. Lanning
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9103
barbara.lanning@usdoj.gov