UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

Sheldon Avery Thomas,

        Defendant.

_____/

Case No. 22-cr-20365

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER (ECF No. 12)

### I.   INTRODUCTION

Defendant Sheldon Avery Thomas is charged in a one count indictment with making a false statement in the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6).  ECF No. 13.  At Thomas' detention hearing on July 12, 2022, Magistrate Judge Jonathan C. Grey determined "the Government carried its burden [of] show[ing] by clear and convincing evidence that there [was] no condition or combination of conditions that [would] reasonably assure the safety of the community . . . ."  ECF No. 14, PageID.94.  He thus ordered Thomas detained pending trial.  ECF No. 11, PageID.25.

1

Presently before the Court is Thomas' Motion for Revocation of Detention Order (ECF No. 28), filed on July 14, 2022.  The Government filed a Response on July 19, 2022, and Thomas replied on July 21, 2022.  The Court held a hearing on the matter on July 26, 2022.  For the following reasons, as well as those the Court discussed on the record at the hearing, Thomas' Motion for Revocation of Detention Order (ECF No. 28) is **DENIED**.

## II.   BACKGROUND

### A. Factual Background

#### 1.   Thomas' relationship with Davis and prior attempts to purchase firearms on his behalf

Thomas met Ehmani Davis, the man for whom he allegedly purchased the firearm, while they both worked at a bakery.  ECF No. 14, PageID.45.  They have been friends since at least July 2021.  *Id.* at PageID.45-46.  When speaking to ATF agents, Thomas described Davis as one of his "best friends."  ECF No. 15, PageID.99.  Despite their close friendship, Thomas suspected Davis of taking his Smith and Wesson 9mm pistol early in their friendship.  *Id.* at PageID.100; ECF No. 14, PageID.60.  Thomas never reported the firearm as missing, however, because Davis was "still [his] boy."  ECF No. 15, PageID.100 (alteration in original).

2

Thomas told ATF agents that he knew Davis "always had beef in the street." *Id*. Thomas was also aware that Davis had problems with his family, including an argument with his brother that resulted in them pointing guns at each other. *Id*. When specifically asked whether he knew about Davis engaging in violent behavior, Thomas told ATF agents Davis "is not to be fucked with." ECF No. 14, PageID.60.

The Government proffered several text message conversations between Thomas and Davis that discuss firearms. First, on July 14, 2021, they appeared to discuss the theft of a firearm that Thomas had purchased and given to Davis.

**Davis**: I ain't laughed one time

**Thomas**: Yea it's cuz that's yo life they took I can always go buy another gun which is exactly wat I'm fina do Friday anyway so [to be honest] I really don't give [a single fuck] it's the principle for me #itswar

Just low down slimy and grimy soft ass n****s bro it be so many n****s in dere talkin crazy but wanna do shit under the radar and be tough later just soft [as hell]

**Davis**: Man if another n**** take anything from you that's disrespect. I was taught whoever you catch stealing chop his hands off I'm on n****s ass tomorrow.

**Thomas**: Facts I'm up there witchu period if any n**** say one thing out the way it's a wrap.

3

**Davis**: It's not even that I just lost my sht. Somebody obviously took it for a reason. Finna fuck my credit up

ECF No. 15-2, PageID.120-22.  Thomas later confirmed for ATF agents that the missing firearm discussed in this exchange was not the Smith and Wesson pistol Davis had taken from him.  ECF No. 14, PageID.79.

About a month later, on August 7, 2021, Davis, who was 19, seemingly asked Thomas to buy him a firearm because he could not legally do so himself.[1]

**Davis**: Bet it up and my brotha said he would take us

**Thomas**: [Alright] bet

U got all the cheese?

**Davis**: Damn near. But if you can't make a bargain wit em ima get something else

**Thomas**: Like what send me a picture the price I need details ion wanna have to walk out and ask it'll make us look suspicious

**Davis**: Ima go in first trust me we gone play it smooth

**Thomas**: Play it cool

---

[1] Although neither Thomas nor Davis explicitly identify the item they intend to purchase, the Government argues Davis' inability to purchase the item on his own, their concern over suspicion, and their future conversations expressly discussing Thomas purchasing a firearm on Davis' behalf all indicate that they were discussing a firearm in this conversation.  ECF No. 15, PageID.101.  The Court agrees.

4

ECF No. 15-4, PageID.127-129.

Subsequently, on February 13, 2022, Davis texted Thomas about Thomas getting him a firearm that day.

**Davis**: Bet bro I gotta do dis shit today n****s had slid through yesterday but it was the wrong house

I got the money on me right now

**Thomas**: The money for the stick?

**Davis**: Yea and I'll throw u some extra just for looking out for me

. . .

**Thomas**: Send me the stick u want and the beans u want with it[2]

**Davis**: I already talked to the people he said he has it in stock

**Thomas**: [Alright] bet

The beans hallow [sic]

**Davis**: Yea

. . .

**Davis**: Don't forget your id [and] everything

---

[2] The Government avers the terms "stick" and "beans" are colloquialisms for a gun and bullets, respectively.  ECF No. 15, PageID.102.

5

ECF No. 15-5, PageID.137-48.

Later that day, Thomas attempted to buy a Glock 19 Gen 5 handgun from ICB Firearms, a Federal Firearms Licensee ("FFL") in St. Clair Shores, Michigan.  ECF No. 15-6.  In the process of completing the Federal Firearms Transactions Record form, Thomas indicated he was the actual buyer of the firearm listed on the form, *i.e.*, not acquiring the firearm on behalf of another person.  *Id.* at PageID.163. Thomas' National Instant Criminal Background Check System ("NICS") background check was delayed, so he was not allowed to take the gun home that day.[3]  ECF No. 15-6, PageID.164.  ICB Firearms directed Thomas to return on February 18, 2022 to complete the purchase.  *Id.*  However, the day Thomas was supposed to return, Davis texted Thomas that he had found something "for way cheaper," ECF No. 15-5, PageID.162, and Thomas did not return, ECF No. 15, PageID.102.

On May 29, 2022, Thomas and Davis went to Action Impact, an FFL in Eastpointe, Michigan.  Gov's Ex. 6.  Thomas later told ATF agents that he and Davis

---

[3] When someone attempts to purchase a firearm from an FFL, the FFL must run a background check for that person through NCIS. NCIS will return one of three responses: "proceed," which allows the FFL to complete the purchase that day; "denied," which prohibits the FFL from selling a firearm to that person; or "delayed," which requires the FFL to delay the purchase for at least three days.  ECF No. 14, PageID.51-52.

6

went to Action Impact so Thomas could buy Davis a handgun.  ECF No. 15, PageID.103.  Thomas attempted to purchase a Glock 22 .40 caliber handgun.  *See* ECF No. 15-7.  Again, he filled out a Federal Firearms Transactions Record form, indicating he was the actual buyer of the firearm.  *Id.* at PageID.169.  He also listed an old address on the form.  ECF No. 14, PageID.55.  Thomas' NICS background check was delayed again, and he was instructed to return on June 7, 2022 to complete the purchase.  ECF No. 15-7, PageID.170.

## 2.  The Instant Offense

On June 2, 2022, Davis texted Thomas that he "just got outta the bullpin [*sic*].[4] ECF No. 15-8, PageID.176.  He also asked Thomas to call Action Impact and reassured Thomas that he still had the money for the firearm.  *Id*.  Thomas informed Davis that Action Impact had confirmed he should return on June 7, 2022.  *Id.* at PageID.177.

On June 7, 2022, Davis reached out to Thomas.  *Id*.  Among other things, he sent Thomas the number for Action Impact.  *Id.* at PageID.178.  Thomas responded that he was "ready," and Davis seemingly ordered him an Uber.  *Id.* at PageID.179-81.

---

[4] Two days prior, Davis had been arrested in Eastpointe Michigan for disorderly conduct.  ECF No. 15-9.  During this incident, he verbally threatened to kill someone.  *Id.* at PageID.193.

7

Thomas went to Action Impact by himself.  ECF No. 15, PageID.104.  He later told ATF agents Davis did not accompany him because Davis did not want his face to be on camera again.  *Id*.  Instead of a Glock 22 handgun, Davis instructed Thomas to buy him a Draco pistol and provided him the cash to complete the purchase.  *Id*.  Thomas was able to complete the purchase and attendant paperwork.[5]  ECF No. 15-7; Gov. Ex. 10.  While at the store, Thomas texted Davis to confirm how many bullets he wanted.  ECF No. 15-8, PageID.187.  As a result, he also purchased two boxes of 7.62x39 caliber ammunition.  ECF No. 15-7; Gov. Ex. 10.

After leaving Action Impact, Thomas met Davis in a White Castle parking lot.  Gov. Ex. 10.   Thomas gave Davis the firearm, and Davis gave Thomas approximately $50 for buying the gun for him.  *Id*.

On July 6, 2022, Davis was involved in a shooting incident with Detroit Police that left both him and Officer Loren Courts dead.  ECF No. 15, PageID.105.  The Draco pistol and spent 7.62 caliber casings were recovered from the scene.  *Id*.  When ATF agents asked Thomas about the incident, he told them he had called Davis on June 20, 2022 and told him, "Don't do nothing fucking stupid because my name is on [the pistol]."

---

[5] The Government also proffers that Thomas listed his girlfriend's phone number instead of his own on the Gun Purchase Checklist.  ECF No. 15-7, PageID.172.

8

### 3.  Proffered Evidence of Other Straw Purchases

The Government also proffered that twice this year, individuals other than Davis texted Thomas about purchasing firearms.  The first instance, which occurred on January 26, 2022, was a direct purchase with someone saved in Thomas' phone as "L.D."

> **L.D.**: Aye Sheldon this lil bro that you gone get the heaters for[6]
>
> Aye big bro I thought you said to call you anytime after 12
>
> **Thomas**: Yea I'm just really getn up had to work late we might have to go tomorrow [to be honest] my money don't get on my card til like 3-4am
>
> But I still gotchu I ain't forget

ECF No. 15-10.  The second exchange, which occurred on May 25, 2022, involves a facilitated purchase through Thomas' girlfriend, whose initials are "S.D."

> **S.D.**: Bae

---

[6] The Government avers "heaters" is a colloquialism for guns.  ECF No. 15, PageID.106.  At the hearing, Thomas proffered that this exchange was referencing actual machines that provide heat and that L.D. was contacting him because he was experiencing homelessness and needed heating.  However, the Court did not, and does not, find this alternative explanation credible.  While the Court acknowledges Defense Counsel's assertion that any interpretation of the text message involves some level of speculation, the Court is familiar with the slang and concludes the Government's interpretation is the more reasonable one.

9

BAE

That's it.

**Thomas**: $600

Not dealin wit dem directly tho only through u if they want it they give u tha cheese and u give me tha cheese and I give the gun to u to give to them

If not that we can't do it

**S.D.**: Duh

But he not answering

**Thomas**: When he do let me know

ECF No. 15-11.

### B. Procedural Background

On July 9, 2022, Thomas was charged in a criminal complaint with making a false statement in acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6). ECF No. 1.  He appeared before Magistrate Judge Grey on July 12, 2022 for a detention hearing.  ECF No. 14.  The Government proffered the above-referenced information.  *See generally id.*  Pretrial Services recommended Thomas remain detained pending trial due to the risk of danger to the community.  ECF No. 14, PageID.83.

10

Ultimately, Judge Grey determined "by clear and convincing evidence that there [was] no condition or combination of conditions which [would] reasonably assure the safety of the community if Mr. Thomas were released."  ECF No. 11, PageID.25.  Judge Grey was particularly concerned with the proffered evidence that Thomas had knowingly transferred a firearm to an individual not legally allowed to possess one and that his actions occurred over the course of several months.  ECF No. 14, PageID.87.  Additionally, Judge Grey emphasized that based on the proffered evidence, "on multiple occasions [Thomas] sought to arm an individual who should not have been armed, that [Thomas] knew he should not have been armed, and that [Thomas], [himself] described him as someone not to be fucked with."  *Id.* at PageID.89.  Judge Grey further noted that based on the proffered evidence and Thomas' statements to ATF agents, there might be additional firearms Thomas purchased circulating in the community.  *Id.* at PageID.91.  Finally, Magistrate Judge Grey determined a GPS tether would not mitigate the risk of danger to the community because it would not stop Thomas from engaging with other friends for whom he might attempt to acquire firearms.  *Id.* at PageID.92.  Accordingly, he ordered Thomas detained pending trial.

Thomas moves to revoke the detention order, arguing the Court can fashion conditions that reasonably assure that he will not pose a danger to the community.

11

ECF No. 12, PageID.31.   Specifically, Thomas argues "there is no substantive evidence indicating that [he] procured firearms prior to the [instant] incident, and certainly no evidence that [he] has a history as a straw purchaser." *Id.*  Instead, the July 14, 2021 text message exchange between Thomas and Davis "at most establishes that [] Thomas lost a firearm or had a firearm stolen, [but] there is nothing within said communication that indicates prior illegal conduct." *Id.* at PageID.32. Moreover, Thomas contends that Magistrate Judge Grey gave undue weight to the Government's speculative assertion that Thomas could have reasonably foreseen that Davis would use the firearm for violent purposes.  *Id.* at PageID.32-33.   For example, Thomas avers nothing about the police report or Davis' text informing him that Davis was released from custody indicates Thomas witnessed Davis' disorderly conduct or knew about the nature of the offense for which Davis was arrested.  *Id.* at PageID.33.   Furthermore, Thomas emphasizes that he has no prior criminal convictions, is currently employed, is welcome to return to living with his girlfriend if released, and has a mother and brother willing to serve as third-party custodians.[7] *Id.* at PageID.34.  Finally, Thomas does not have a passport, and has significant ties to the community.  *Id.*

---

[7] At the hearing on the Motion, Defense Counsel also shared that Thomas' girlfriend is currently expecting their first child and that Thomas is the primary source of income for their household.

12

The Government opposes Thomas's Motion.  ECF No. 15.  It asserts that the nature and circumstances of Thomas' offense are "exceptionally dangerous" because this offense "was the product of concerted and repeated efforts to put a handgun in the hands of person he knew to be dangerous, and who was legally prohibited from purchasing such a firearm."  *Id.* at PageID.108.  Moreover, the Government avers Thomas' conduct and judgment "have proven to be terrible."  *Id.* at PageID.112. Finally, given that at least one firearm Thomas purchased has not yet been recovered and the significant level of gun violence in the City of Detroit, the Government maintains that Thomas's "release would pose a substantial risk to the safety of the community."  *Id.* at PageID.115.  The Government emphasizes that "Thomas could return to a private firearms seller today and obtain as many guns as he wanted."  *Id.* at PageID.117.

Thomas reasserts that he is alleged to have provided one firearm to one individual and that he is neither charged with committing a violent crime nor conspiring with others to commit a violent crime. ECF No. 17, PageID.260. Accordingly, Thomas urges the Court to "refrain from making a decision based upon the actions of others and/or the publicity surrounding said actions . . . ."  *Id.*  Thomas also maintains that the Government's arguments rely on evidence of his alleged guilt, as opposed to evidence of his alleged dangerousness, which is improper.  *Id.*

13

at PageID.261-62.  He avers he has no prior criminal convictions and that this District has historically found such defendants do not pose a clear and convincing risk of dangerousness.  *Id.* at PageID.262.  Finally, Thomas reiterates that he is self-employed, though he is willing to seek further employment if necessary; also, his girlfriend and mother are both willing and able to serve as third-party custodians.

### III.  LAW & ANALYSIS

#### A. Legal Standard

Title 18 U.S.C. § 3145(b) allows a district judge to review a magistrate judge's order detaining a defendant.  It is a *de novo* review.  *United States v. Williams*, 948 F. Supp. 692, 693 (E.D. Mich. 1996).  "The default position of the law . . . is that a defendant should be released pending trial."  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  Generally, for a defendant to be detained, the government must establish the (1) "risk of flight by a preponderance of the evidence" or (2) "dangerousness to any other person or the community by clear and convincing evidence."  *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).  Pre-trial detention shall be ordered only if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).

14

In determining whether there are conditions which will reasonably assure the appearance of the person and the safety of the community, the district court must make findings based on the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger posed by the person's release.  18 U.S.C. § 3142(g).

**B. Discussion**

The parties do not dispute that the Government has not established that Thomas poses a risk of flight.  Thus, the Court will focus its analysis on whether the Government has established dangerousness to the community by clear and convincing evidence.   For the following reasons, the Court concludes the Government has carried its burden and there is no condition or combination of conditions that will reasonably assure the safety of the community if Thomas is released.

**1.  Nature and Circumstances of the Offense**

The first factor the Court must consider is the nature and circumstances of the offense charged against Thomas.  The nature and circumstances of this offense are serious.  The Government alleges Thomas lied on the Federal Firearms Transactions Record form when he affirmed he was the actual buyer of the Draco pistol, *i.e.*, not

15

acquiring the firearm on behalf of another person.  Despite what he indicated on the form, as soon as he exited the Action Impact, Thomas gave the pistol to Davis, someone who Thomas knew was not legally permitted to own such a firearm.

As a threshold matter, Congress has specified that an offense which involves a firearm, as is the case here, is a categorically serious offense.  *See* 18 U.S.C. § 3142(g)(1) (directing court to consider whether the offense, *inter alia*, involved a firearm).  Indeed, firearms are inherently dangerous, which is why they are regulated so heavily and why Congress bars certain groups of people from possessing them.  One such group consists of people under the age of 21.  *See* 18 U.S.C. 922(b)(1) (prohibiting FFLs from selling or delivering firearms other than shotgun or rifles or ammunition other than that for a shotgun or rifle to any individual who the FFL knows or has reasonable cause to believe is less than 21 years of age).  Nevertheless, Thomas, who is 26, allegedly diligently attempted to acquire a firearm on Davis' behalf between February and June 2022, despite Davis only being 19.  The Court is concerned about guns ending up in the hands of youths, particularly in this situation where the person to place the gun there was so much older.  Thomas had several months in which he could have deviated from his course of action, but he allegedly chose to continue attempting to arm someone he knew legally should not have been armed.

16

Moreover, the Government alleges that Thomas knew Davis to be violent, someone "not to be fucked with," prior to acquiring the pistol for him.[8]  While the Court acknowledges there is no express evidence in the record that Thomas knew the circumstances of Davis' May 30, 2022 arrest, there is other proffered evidence that Thomas knew, or at least recklessly disregarded, the danger inherit in arming Davis.  First, Thomas allegedly told ATF agents that he knew Davis "always had beef in the street."  ECF No. 15, PageID.100.  Indeed, on February 13, 2022, Davis texted Thomas he needed to get a firearm that day, seemingly because people had been looking for him.  *See* ECF No. 15-5, PageID.137-48 ("Bet bro I gotta do dis shit today n****s had slid through yesterday but it was the wrong house.").  Regardless of whether Davis planned to protect himself if approached or if he planned to affirmatively seek out the people looking for him, it is clear he wanted the firearm because he anticipated a violent altercation.

---

[8] Thomas' contention that it was Davis' age, and not a criminal history or history of mental illness, that precluded Davis from purchasing a firearm on his own misses the mark.  At the end of the day, it was illegal for Davis to own the Draco pistol. Knowing this, Thomas allegedly purchased it for Davis anyway.  The Government's argument, and the basis for Magistrate Judge Grey's detention order, is that Thomas' alleged decision was particularly egregious because he knew Davis to be a violent person and Thomas should have known Davis was likely to use the gun in criminal activities and/or to harm others.

17

Second, Thomas also allegedly told ATF agents that he was aware Davis had had at least one altercation with his brother that ended with them pulling guns on each other.  This evidences that Thomas was aware Davis had a willingness to use guns on other people.  Third, Thomas felt the need to warn Davis not to do anything stupid with the gun.  The Court acknowledges there are various reasons why Thomas may have done this.  Nevertheless, given the nature of Thomas' relationship with Davis and the Court's understanding of Davis' personality, the Court is persuaded that Thomas meant it as a warning because he knew that his friend was likely to do something reckless, if not violent, and he did not want to be implicated in the fallout.

Accordingly, the Court concludes the nature and circumstances of the offense favor detention.

### 2.  Weight of the Evidence of Dangerousness

The second factor the Court must consider is the weight of the evidence against Thomas.  "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt."  *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010); *see also United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).

The weight of the evidence of dangerousness is quite high in this case.  As discussed *supra*, Thomas allegedly armed someone Congress had determined was

18

too young to own such a firearm.  Moreover, he armed someone whose proclivity for violence he either knew of or recklessly disregarded.  Beyond simply arming Davis, Thomas also allegedly procured hollow-point, armor-piercing, bullets for him, despite his knowledge of Davis' violent tendencies.

Additionally, it is unclear how many firearms that Thomas purchased are loose in the community.  The Draco pistol has been recovered and removed from circulation; however, the Smith and Wesson pistol and the stolen firearm discussed on July 14, 2021 have yet to be recovered.[9]  Moreover, the Court notes that, based on the proffered evidence, there are potentially two additional firearms at large: (1) the replacement firearm Thomas said he was planning to buy the Friday following July 14, 2021, and (2) the firearm Thomas and Davis seemed to purchase on August 7, 2021.

---

[9] The Court also acknowledges that Thomas seems to have shown a careless disregard for these missing firearms.  He told ATF agents he told agents that he never reported the Smith & Wesson pistol missing because he suspected Davis of taking it, and Davis "was still [his] boy."  ECF No. 15, PageID.100.  Additionally, when Thomas and Davis were texting about the additional missing firearm on July 14, 2021, Thomas said he "really d[idn't] give [a single fuck]" because he "can always go buy another gun."  ECF No. 15-2, PageID.120.  Instead, he was upset by "the principle" of the thing.  *Id*.

19

The Court also notes that, even if Thomas did not ultimately purchase firearms for them, at least two other individuals allegedly perceived him as a potential avenue for circumventing firearm regulations.

Moreover, although Thomas avers there are ways to mitigate concerns about him procuring guns for others, specifically through home confinement, the Court disagrees. Thomas' situation is dissimilar from those of the defendants who are good candidates for home confinement. He can still acquire firearms from private dealers, who are not subject to same the requirements as FFLs and, importantly, can meet with him anywhere. Thus, any time someone visits the house or any opportunity to leave the house, such as for court appearances or doctors' visits, becomes a chance for Thomas to acquire another firearm.[10] Once the firearm has been acquired, the Government has suggested Thomas need not interact directly with the person for whom he purchased it. The Government proffered a text exchange between Thomas and his girlfriend in which he explicitly required that she facilitate the transaction. Thus, the Court concludes home confinement does not alleviate concerns about his ability to acquire firearms on behalf of others.

---

[10] As the Court noted during the detention hearing, home confinement does not actually require a defendant to stay in his house at all times, which would be unrealistic given the length of pretrial detention; he is permitted to leave for certain pre-approved reasons.

Accordingly, the weight of the evidence of Thomas' dangerousness weighs in favor of detention.

### 3. History and Characteristics of the Defendant

The third factor requires that the Court review Thomas' history and characteristics, which are statutorily separated into two categories. The first category examines the "person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). The second category asks "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." 18 U.S.C. § 3142(g)(3)(B).

Beginning with the second category, Thomas has no prior criminal convictions, which support his motion for revocation of the detention order.[11] The first category is less straightforward. Thomas has allegedly exhibited exceedingly poor judgement. Nevertheless, he has no prior criminal convictions, a supportive

---

[11] The Court acknowledges that Thomas was involved in a shooting death incident in 2021 that the state prosecutor determined was self-defense. Accordingly, the Court will not consider this factor in assessing Thomas' criminal history.

21

family, consistent employment, and strong community ties.   The Court also acknowledges that Thomas has a child on the way and that he is the primary provider for his household.   Overall, the Court finds that this factor favors revoking the detention order.

### 4.  Nature and Seriousness of the Danger Posed by the Defendant's Release

The fourth and final factor demands that the Court consider "the nature and seriousness of the danger to any person or the community that would be posed by person's release."   18 U.S.C. § 3142(g)(4).   The Court must "look to more than whether or not the defendant himself has been guilty of physical violence," but also to the safety of the community as a whole.   *United States v. Vance*, 851 F.2d 166, 169 (6th Cir. 1988).

It is indisputable that the Eastern District of Michigan has a gun problem.   The City of Detroit, in particular, suffers from significant amounts of firearms-related violence.   For example, in 2021, the Detroit Police Department reported 309 homicides and 1,065 non-fatal shootings.   *See* DeJanay Booth, *Report: Detroit Homicides, Non-Fatal Shootings Drop In 2021*, CBS DETROIT (January 6, 2022), https://detroit.cbslocal.com/2022/01/06/report-detroit-homicides-non-fatalshootings-drop-in-2021/.   Thomas is charged with contributing to this problem. He allegedly purchased the Draco pistol for Davis, despite knowing he was someone

22

who was likely to use it to harm others.  Then, less than a month later, Davis used the pistol to open fire on Officer Courts and his partner when they responded to an emergency call.

Thomas tries to characterize the alleged purchase of the Draco pistol as an isolated incident.  However, this description is undermined by his dedication over several months to acquiring a firearm for Davis as well as the two other individuals who contacted him for straw purchases.  Thus, for all the reasons set forth above, the Court finds Thomas would pose a danger to the community if released pending trial. Furthermore, the Court weighs strongly the recommendation from Pretrial Services, which concluded that there was no condition or combination of conditions that could reasonably assure the safety of the community.

Finally, the Court notes Thomas' girlfriend would not be a proper third-party custodian in this situation.  While she does not appear to have any prior criminal convictions, the Government has proffered a text exchange between her and Thomas in which she seems to be facilitating an illegal firearm transaction.  The Court also notes that the Government has proffered that she initially lied to police about what occurred during the shooting that was deemed to be self-defense.  Nor is Thomas' mother an appropriate third-party custodian because Thomas' brother, who has a pending case in Wayne County Third Circuit Court for assaulting or resisting a

23

police officer and carrying a concealed weapon, currently lives with her.  While Defense Counsel indicated at the detention hearing before Magistrate Judge Grey that the brother would move out, ECF No. 14, PageID.76, the Court has not received any further details regarding that proposal.  Indeed, as it is likely his own bond is contingent on remaining at his mother's house, it would be inappropriate for the Court to require him to leave for Thomas' benefit.

This final factor thus also weighs in favor of detention.

## IV.   CONCLUSION

In sum, three of the four factors under § 3142(g) weigh in favor of detention. Accordingly, for the reasons articulated above Thomas' Motion for Revocation of Detention Order (ECF No. 28) is **DENIED**.

**IT IS SO ORDERED**.

/s/ Gershwin Drain_____
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  August 2, 2022

24

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 2, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

25