UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,               Case No.: 22-cr-20365

v.

                                         Honorable Gershwin A. Drain

SHELDON AVERY THOMAS,

        Defendant.
_____/

## **GOVERNMENT'S SENTENCING MEMORANDUM**

This district has a gun problem.[1] In any discussion about gun regulations—which are often precipitated by unspeakable tragedy—one question is inevitable: if there are laws in place to prevent it, how do criminals get their hands on guns? Sheldon Thomas is the answer. Thomas and other straw purchasers just like him are putting guns into the hands of people with violent intentions like Ehmani Davis. And here, getting a firearm into Davis' hands was not easy. Thomas' first attempts to buy a gun for Davis failed. But, on June 7, 2022, he was finally successful, purchasing a Draco pistol—a handgun that shoots rifle rounds—and immediately

---

[1] According to the latest judicial caseload statistics, 765 cases were filed in the Eastern District of Michigan in 2022. Of those, 239—more than 31% —were firearm and explosive cases. See Administrative Office of the U.S. Courts, U.S. District Courts Criminal Federal Judicial Caseload Statistics (March 31, 2022), available at https://www.uscourts.gov/statistics/table/d-3/federal-judicial-caseload-statistics/2022/03/31.

1

handing it over to Davis. Less than a month later, Davis used the Draco to murder Detroit Police Officer Loren Courts.

Because the facts of this case are serious the United States recommends a 24-month sentence followed by a term of supervised release. Such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008).

**I.    FACTUAL BACKGROUND**

On July 6, 2022, as Detroit Police Officer Loren Courts and his partner responded to a 911 call for shots fired—an all-too-common occurrence in the City of Detroit—they were ambushed by Ehmani Davis. The officers had just arrived at the scene when Davis opened fire from an upstairs window of an apartment, striking Courts in the neck. Officer Courts' partner prioritized rendering aid to Courts, applying pressure to his wound as Davis exited the apartment and began to approach them. Assisting officers shot and killed Davis as he continued to threaten officers. Despite the heroic efforts of his partner and other officers, Officer Courts later succumbed to his injuries.

Officers recovered a loaded 7.62 caliber Draco pistol from Davis' possession. ATF agents ran a trace on the firearm and found out that the weapon was purchased

by Sheldon Thomas from Federal Firearms Licensee (FFL) Action Impact in Eastpointe, Michigan on June 7, 2022.

ATF agents recovered a copy of ATF Form 4473 from Action Impact and discovered that prior to purchasing the Draco pistol on June 7, 2022, Thomas attempted to purchase a Glock 22 handgun on May 29, 2022. *See* Exhibit 1, 4473 Form Glock 22 and Draco – 05.29.22.

After identifying Thomas as the purchaser of the Draco pistol, agents interviewed him regarding his relationship to Davis and his attempted and completed firearms purchases. During the interview, when ATF agents confronted Thomas with what Davis had done, Thomas told the agents that he had called Davis on June 20, 2022—two weeks before the homicide—and specifically told him "[d]on't do nothing fucking stupid because my name is on it," referencing the Draco pistol.

### A. Sheldon Thomas and Ehmani Davis

Sheldon Thomas—26 years old—and Ehmani Davis—19 years old—were best friends, according to Thomas. That claim is corroborated by Thomas' cell phone records. In an 11-month period, Davis and Thomas exchanged 369 calls and texts. Thomas told ATF agents that he continued to be Davis' best friend even after believing that Davis took his Smith and Wesson 9mm firearm. ATF agents corroborated that Thomas owned a Smith and Wesson 9mm pistol by obtaining the

3

4473 form Thomas filled out to purchase the firearm and the pistol sales record. *See Exhibit 2*, 4473 Form Smith and Wesson – 04.30.20. Thomas told agents he never reported the firearm as stolen because Davis was "still [his] boy."

Davis felt comfortable asking Thomas to buy a firearm for him on multiple occasions. On August 7, 2021, Thomas and Davis exchanged the following text messages:

> *Davis*: Bet it up and my brotha said he would take us
>
> *Thomas*: U got all the cheese?
>
> *Davis*: Damn near. But if you can't make a bargain wit em ima get something else
>
> *Thomas*: Like what send me a picture the price I need details ion wanna have to walk out and ask it'll make us look suspicious
>
> *Davis*: Ima go in first trust me we gone play it smooth
>
> *Thomas:* Play it cool

*See Exhibit 3*, Thomas and Davis Texts 08.07.21.

In these text messages, Thomas and Davis use coded language, but their intent is obvious. The item Thomas and Davis were discussing purchasing on August 7th was one that Thomas could legally purchase, and Davis could not. It was an item that they were worried about arousing suspicion over. It was an item that Davis was specifically selecting, and Thomas needed a picture of to recognize. It was a handgun. This conclusion is supported by Thomas and Davis' later messages

wherein Davis explicitly asks Thomas to purchase a handgun for him on three separate occasions.

### B. The February 13, 2022 Attempted Straw Purchase for Davis

Thomas attempted to purchase a handgun for Davis in February 2022. On February 13, 2022, Thomas and Davis exchanged the following text messages:

> ***Davis***: Bet bro I gotta do dis shit today n****s had slid through yesterday but it was the wrong house
>
> I got the money on me right now
>
> ***Thomas***: The money for the stick?
>
> ***Davis***: Yea and I'll throw u some extra just for looking out for me
>
> …
>
> ***Thomas***: Send me the stick u want and the beans u want with it[2]
>
> ***Davis***: I already talked to the people he said he has it in stock
>
> ***Thomas****:* [Alright] bet
>
> The beans hallow [sic]
>
> ***Davis***: Yea

*See Exhibit 4*, Thomas and Davis Texts 02.13.22–02.18.22.

The pair continued to exchange messages on February 13th, discussing the arrangements for Davis to pick Thomas up and give him a ride, and Davis reminded Thomas not to forget his I.D. *Id.*

---

[2] A "stick" is a frequently used colloquial term for a gun. "Beans" is a colloquial term for bullets.

That same day, Thomas attempted to buy a Glock 19 Gen 5 handgun—a firearm capable of shooting hollow-point bullets—from ICB Firearms, an FFL in St. Clair Shores, Michigan. *See Exhibit 5*, 4473 Form Glock 19 Gen 5 – 02.13.22. In completing the form, Thomas represented he was the actual buyer of the firearm and that he was not purchasing the firearm on behalf of another person. *Id.* Thomas' NICS background check was delayed, and Thomas was not allowed to take the gun home that day. The FFL directed Thomas to return on February 18, 2022 to complete the purchase of the firearm. However, on February 18, 2022, Davis texted Thomas, telling him that he had found something "for way cheaper" and Thomas did not return to ICB Firearms to complete the purchase of the Glock 19. *See Exhibit 4*.

### C. The May 29, 2022 Attempted Straw Purchase for Davis

On May 29, 2022, Thomas and Davis went together to Action Impact, an FFL in Eastpointe, Michigan. *See Exhibit 6*, Surveillance Video from Action Impact on 05.29.22. Thomas told agents he and Davis went to the FFL because Davis wanted Thomas to buy him a Glock 22 handgun. Davis was only 19 years old and was prohibited from purchasing a handgun. Thomas attempted to purchase a Glock 22 .40 caliber handgun for Davis. Again, Thomas filled out and ATF 4473 form, and again represented that he was the actual buyer of the firearm and that he was not purchasing the firearm on behalf of another person. *See Exhibit 1* 4473 Form Glock

22 and Draco – 05.29.22. Thomas' NICS background check again resulted in a "delayed" status, and Thomas was instructed to return to complete the purchase on June 7, 2022. *Id.*

### D. The June 7, 2022 Straw Purchase of the Draco for Davis

On June 2, 2022, Davis sent Thomas a text telling him he had just been released from jail. Davis asked Thomas to call Action Impact and told Thomas that he still had money for him. *See Exhibit 7*, Thomas and Davis Texts 06.02.22–06.11.22. Two days prior, Davis had been arrested in Eastpointe for threatening to kill someone and disorderly conduct. *See Exhibit 8*, Eastpointe Case Report.

On June 7, 2022, Davis reached out to Thomas again. Davis sent Thomas the phone number to Action Impact, and Thomas responded that he was ready. *See Exhibit 7*. The two then discussed the arrangements for Davis to transport Thomas to Action Impact. *Id.*

On the afternoon of June 7, 2022, Thomas showed up to Action Impact, this time by himself. Thomas told ATF agents that Davis didn't go with him to complete the purchase because Davis did not want his face to be on camera again. Davis' directions to Thomas changed since the attempted purchase on May 29th. Instead of a Glock 22 handgun, Davis instructed Thomas to buy him a Draco pistol. Davis gave Thomas the cash—more than $1,200—to complete the purchase. On surveillance video from Action Impact, Thomas entered the store, completed the

4473 Form, gun purchase checklist, and sales paperwork. *See Exhibit 6* and *Exhibit 9*, Surveillance Video from Action Impact and White Castle on 06.07.22. While inside the FFL, Thomas confirmed with Davis that he wanted 30 bullets. *See Exhibit 7*, p. 12. Davis told Thomas he was just down the street, waiting at bus stop by White Castle. *Id*. at 7. When the sale was completed, Thomas walked out of Action Impact with the Century Arms Draco pistol and two boxes of 7.62x39 caliber ammunition. *See Exhibit 6* and *Exhibit 9*. After leaving the FFL, Thomas met up with Davis in the White Castle parking lot. *See Exhibit 9*. Thomas then gave the firearm to Davis. Davis paid Thomas approximately $50 for buying the gun for him.

Thomas bought the Draco pistol for Davis despite knowing he was dangerous. Thomas told ATF agents he knew Davis "always had beef in the street" on top of problems he had with his own family. Thomas told agents the last incident he knew about with Davis was when Davis and his brother had an argument that resulted in the brothers pointing guns at each other's heads. In his own view of Davis, Thomas described him as a person who "wasn't the type of guy that you really wanted to have beef with" and told agents "Monie was not to be fucked with."

### E. Evidence of other Straw Purchases

Thomas' reputation as a source for guns extended beyond Davis. Among his social circle, he was known as a source for weapons. In the six-month period leading up to Thomas' arrest, two individuals other than Davis texted Thomas about getting

a gun. In one instance on January 26, 2022, Thomas exchanged the following messages with a contact saved in has phone with the initials "L.D.":

> **L.D.**: Aye Sheldon this lil bro that you gone get the heaters for
> Aye big bro I thought you said to call you anytime after 12
>
> **Thomas**: Yea I'm just really getn up had to work late we might have to go tomorrow tbh my money don't get on my card til like 3-4am
>
> But I still gotchu I ain't forget

*See Exhibit 10,* Thomas and "L.D." Texts 01.26.22.

Later, on May 25, 2022, Thomas exchanged the following messages with his girlfriend, whose initials are "S.D.":

> **S.D.**: Bae
> BAE
> That's it.
>
> **Thomas**: $600
>
> Not dealin wit dem directly tho only through u if they want it they give u tha cheese and u give me tha cheese and I give the gun to u to give to them
>
> If not that we can't do it
>
> **S.D.**: Duh
> But he not answering
>
> **Thomas**: When he do let me know

*See Exhibit 11*, Thomas and "S.D." Texts 05.25.22.

Thomas' texts with his girlfriend—the same person who in a letter to this Court described the "predicament" Thomas is in as a "flaw of his doting temperament"—evidence that Thomas was willing to purchase firearms for

9

individuals that may not have been known to him for the cost of $600, and that his girlfriend was prepared to facilitate it.

## II. SENTENCING GUIDELINE CALCULATION

On December 12, 2022, Mr. Thomas pleaded guilty to Count One of the Indictment, charging him with False Statements in Acquisition of a Firearm in violation of Title 18, United States Code, Sections 922(a)(6). PSR ¶ 6. The United States Probation Office calculated Mr. Thomas' criminal history category to be I and offense level of 15. PSR ¶ 84. The government concurs with the calculation of the guidelines in the PSR, resulting in a sentencing guideline range of 18 to 24 months.

## III. APPLICATION OF 18 U.S.C. § 3553(a)

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a sentence that is "sufficient, but not greater than necessary." Those objectives are: (i) the nature and circumstances of the offense, and the history and characteristics of the defendant; (ii) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (iii) the kinds of sentences legally available; (iv) the Sentencing Guidelines; (v) Sentencing Commission policy statements; (vi) the need to avoid unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct; and (vii) the need for restitution. The most relevant factors are set forth below.

### A. Nature and Circumstances of the Offense and the History and Characteristics of the Offender, 18 U.S.C. § 3553(a)(1)

This offense is the product of concerted and repeated efforts by Mr. Thomas to put a handgun in the hands of a person he knew to be dangerous, and who was legally prohibited from purchasing such a firearm. Time and again, Thomas flaunted state, local, and federal laws regulating how persons may buy, sell, and obtain firearms. After multiple failed attempts, Thomas was successful in arming Ehmani Davis—a person he described as someone who "was not to be fucked with"—with an assault style weapon. The firearm and ammunition Davis sought is inherently dangerous; Davis requested Thomas purchase hollow-point bullets and a pistol that shoots rifle rounds. Weaponry like that is designed for damage.

Thomas had multiple warning signs that Davis was a dangerous person in a dangerous situation. Thomas knew Davis had taken a 9mm Smith and Wesson handgun from him not long before he attempted to purchase Davis another firearm. Thomas knew that Davis was recently released from jail when he solicited Thomas to buy the Draco pistol. Thomas knew Davis was a person who "always had beef in the streets." And, Thomas knew the details of at least one specific incident where Davis put a gun to his brother's head after an argument. In this respect Thomas is different from many of the straw purchasers that come before this Court; Thomas

11

took a knowing risk by purchasing a firearm for a person he, himself, described as a person you didn't really "want[] to have a beef with." Thomas created and deliberately disregarded the risk that the Draco pistol would be used to criminally injure or kill another person, which is exactly what happened.

In August 2021, Thomas killed a man. He picked up a gun and shot him, killing him instantly. That killing has been determined to have been a justifiable homicide. But even so, Thomas should recognize the lethality and dangerousness of firearms more than most.

Thomas has no stable employment history, no high school diploma, and seemingly receives much of his support from his mother and brother. In his sentencing memorandum, Thomas seems to offer his unemployment as an excuse for his actions. *See* Defense Sentencing Memorandum, at p. 3–4). But Thomas was not without options. Job openings in the United States between February 2022 and June 2022—the time period in which Thomas made repeated efforts to purchase a handgun for Davis—were at historic highs. *See* U.S. Bureau of Labor Statistics. (n.d.). *Job openings decreased to 10.7 million in June 2022*. U.S. Bureau of Labor Statistics. Retrieved March 30, 2023, from https://www.bls.gov/opub/ted/2022/job-openings-decreased-to-10-7-million-in-june-2022.htm. Thomas spent considerable time and effort to make sure Davis was armed with a handgun for approximately $50. If he had put the same effort into obtaining a job, even one working remotely,

from the comfort of his computer, his return on investment would have been significantly higher and it is likely that Officer Courts would be home with his family today.

Thomas has no criminal history, but this Court should give that consideration substantially less weight than it might ordinarily be accorded precisely because firearms trafficking offenses like this one must, of necessity, always involve defendants who have no felony convictions and minimal criminal history. The egregious nature and circumstance of Thomas' crime and his history and characteristics weigh in favor of a 24-month sentence.

### B. Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment, 18 U.S.C. § 3553(a)(2)(A)

This is an exceptionally serious case. The end result of Thomas' actions is a police officer who was killed for simply doing his job. Officer Courts will never return home to his children or his wife because of Sheldon Thomas' choices. This Court can and should consider the damage caused by firearm that Thomas unlawfully obtained and distributed. United States v. Ratliff, 1995 WL 299030 (6th Cir. 1995)(shooting of a State Trooper by individual using firearm unlawfully sold by the defendant properly considered part of defendant's relevant conduct at sentencing). Where a defendant like Thomas unlawfully obtains and transfers a firearm to someone who he knows to be dangerous, it is plainly a reasonably

foreseeable consequence that someone else—including police officers—could be shot and seriously injured or killed.

"No piece of information is more important under federal firearms law than the identity of a gun's purchaser—the person who acquires a gun as a result of a transaction with a licensed dealer." *Abramski v. United States*, 573 U.S. 169, 193 (2014). A straw purchaser, one "who buys a gun on someone else's behalf while falsely claiming that it is for himself," conceals that identity and thwarts "application of essentially all of the firearms law's requirements." *Id*. at 188-89. Where a defendant like Mr. Thomas unlawfully obtains and transfers a firearm to someone, it is plainly a reasonably foreseeable consequence that someone else—including police officers—could be shot and seriously injured or killed. And unfortunately, it happens too often in our community.

Firearms-related violence is a significant problem in the City of Detroit, one that has taken a staggering toll in terms of human lives and suffering. All of this violence obviously begins with the perpetrators—like Davis—acquiring firearms. In 2020, there were 327 homicides and 1,173 non-fatal shootings inside the city. *See* Detroit Police Department 2020 Year End Stats (available at https://detroitmi.gov/sites/detroitmi.localhost/files/2021-01/2020%20Year%20End%20Stats.pdf). The statistics for 2021 and 2022 were comparable, with the department reporting 308 homicides in 2021 and 309

homicides in 2022. *See* Kara Berg, Detroit police: Juveniles cause large increase in carjackings in 2022, (January 9, 2023), https://www.detroitnews.com/story/news/local/detroit-city/2023/01/09/carjackings-detroit-police-juveniles-cause-large-2022-increase/69791373007/. As unacceptably high as these numbers are, these numbers do not count other criminal offenses involving firearms such as robberies, threats, and shots fired where no one is hit. What all these numbers add up to is a city where the core right of its citizens to live in their homes and on their streets without fear for their physical security is an uncertain right, at best.

A custodial sentence of 24 months would better reflect the seriousness of this offense, justly punish Mr. Thomas' behavior and promote respect for the law than an 18-month sentence would.

    **C.**    **To Afford Adequate Deterrence to Criminal Conduct, 18 U.S.C. § 3553(a)(2)(B)**

The need for general deterrence of all unlawful transfers of firearms is exceptionally high. It is literally a matter of life and death. Given the prevalence of firearms-related violence in Detroit and across the nation, the deterrence of the unlawful distribution of firearms is a critical component of a reasonable sentence. See *United States v. Politano*, 522 F.3d 69 (1st Cir. 2008). Straw purchases of firearms are not easily detected, because their illegality only becomes apparent when the straw purchaser's true intent is revealed by a subsequent transfer to an actual

15

buyer. *See* William J. Krouse, Cong. Research Serv., RL 32842, Gun Control Legislation 26 (2012). Because detection after-the-fact is so difficult, deterrence before-the-fact becomes paramount in these types of cases. The facts of this very case demonstrate the difficulty with straw purchase detection. The defendant's attempted straw purchase of a handgun on February 13, 2022 was not detected by law enforcement. Neither was his attempted straw purchase on May 29, 2022. Without law enforcement intervention, Mr. Thomas had the opportunity to successfully complete the straw purchase of the Draco pistol nearly a week later.

The specific class of offenders to which Mr. Thomas belongs—straw purchasers—is uniquely susceptible to deterrence. This is so because to purchase a firearm from a federally licensed dealer, one must be an adult without a felony conviction or other disqualifying condition (drug use, domestic violence misdemeanor, and so forth). Thus, the universe of potential straw purchasers largely consists of law-abiding adults, who overwhelmingly conform their conduct to the requirements of the law. Arguably, this group is more likely to respond to a strong deterrent message than other classes of potential (or actual) criminals.

Finally, this case, because of all of the attendant publicity, presents a unique vehicle to get a deterrent message out to the entire community. This community has been understandably shaken by the killing of Officer Courts. *See* Exhibit 12, Sampson, E. (2022, August 1) *Detroit resident witnessed fatal police officer*

*shooting. It still haunts her*. The Court thus has an opportunity to send a message that will resonate and deter potential offenders long after the defendant is sentenced. The United States respectfully request that this Court send an unequivocal message of *absolute intolerance* for the unlawful acquisition and distribution of firearms.

    **D.    Provide Thomas with needed educational training and correctional treatment, 18 U.S.C. § 3553(a)(2)(D)**

In According to the PSR, Mr. Thomas has not completed his high school education or obtained a GED certificate. PSR ¶ 67. Mr. Thomas may benefit from participation in the Bureau of Prisons Literacy Program, which is designed to prepare inmates to get their GED credential.

Mr. Thomas has struggled to maintain consistent employment. In that regard, he may benefit from Occupational Education Programs, designed to help inmates acquire marketable skills in a wide variety of trades. He may also benefit from the Federal Prison Industries Program, which seeks to help prepare inmates for successful reentry through job training. BOP also offers a number of programs that are aimed at mental health treatment.

Each of these programs would help to stabilize the defendant and decrease the likelihood of recidivism. However, if the Court were to grant the defense's request for an 18-month sentence, it is unlikely Thomas—who already has 10 months' worth of jail credit—would reap the benefits of any of those programs.

17

### III. CONCLUSION

For the foregoing reasons, the Government respectfully recommends that the Court sentence Defendant Sheldon Thomas to **24 months'** imprisonment followed by supervised release.

                                        Respectfully submitted,

                                        DAWN N. ISON
                                        United States Attorney

                                        /s/ Barbara K. Lanning
                                        Barbara K. Lanning
                                        Assistant United States Attorney
                                        211 Fort Street, Suite 2001
                                        Detroit, MI 48226
                                        (313) 226-9103
                                        Barbara.lanning@usdoj.gov

Dated: March 31, 2023

## Certificate of Service

I hereby certify that on March 31, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Leon Parker
*Counsel for Defendant Sheldon Thomas*

/s/ Barbara K. Lanning
Barbara K. Lanning
Assistant United States Attorney
211 Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9103
Barbara.lanning@usdoj.gov
